**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAY E. MICHAEL, as the | : | |
| Administrator of the Estate of | : | |
| Alexander S. Menhenett, deceased | : | |
| 729 S. Front Street | : | |
| Columbus, Ohio 43206 | : | |
| | : | Case No. 2:24-cv-4002 |
| Plaintiff, | : | |
| | : | Judge: |
| v. | : | |
| | : | |
| CITY OF WHITEHALL | : | |
| c/o Bradley Nicodemus | : | |
| 360 S. Yearling Road | : | **COMPLAINT** |
| Whitehall, Ohio 43213 | : | |
| | : | **Jury Demand Endorsed Herein** |
| and | : | |
| | : | |
| KYLE D. SCHNEIDER | : | |
| Whitehall Police Department | : | |
| c/o Bradley Nicodemus | : | |
| 360 S. Yearling Road | : | |
| Whitehall, Ohio 43213 | : | |
| | : | |
| and | : | |
| | : | |
| OFF DUTY SERVICES, INC. | : | |
| c/o CT Corporation System | : | |
| 4400 Easton Commons Way, Suite 125 | : | |
| Columbus, Ohio 43219 | : | |
| | : | |
| and | : | |
| | : | |
| WALMART, INC. | : | |
| c/o CT Corporation System | : | |
| 4400 Easton Commons Way, Suite 125 | : | |
| Columbus, Ohio 43219 | : | |
| | : | |
| Defendants. | : | |

## THE PARTIES

1.　　Plaintiff Jay Michael is the Administrator of the Estate of Alexander Menhenett. He brings this action on behalf of the Estate of Alexander Menhenett, including Alex's mother, Paula Menhenett, his sister, Tessa Menhenett, and his other family members and next of kin.

2.　　Defendant City of Whitehall is a political subdivision of the State of Ohio.  It is a duly authorized and established municipality located in Franklin County.  Pursuant to Ohio Revised Code §737.051(A) and Whitehall Codified Ordinance §141.09, Defendant City of Whitehall established an auxiliary police force under the control of the Whitehall Police Department.  Although it is a non-paid volunteer position with the Whitehall Police Department, the Whitehall Police Chief maintains control over the assignment, training, stationing, and the direction of work of the auxiliary police force.

3.　　Defendant Kyle Schneider was an auxiliary police officer for the Whitehall Police Department acting within the scope of his duties and commission at the time of the subject incident described herein.  He was acting under the color of state law when he used excessive force against Alex Menhenett as part of an unlawful arrest that occurred on January 19, 2024, at a Walmart store located at 3657 E. Main St., Whitehall, Ohio.  Defendant Kyle Schneider is being sued in his individual capacity.

4.　　Defendant Off Duty Services, Inc. is a foreign corporation with its principal place of business in Houston, Texas, that is registered to do business in the State of Ohio.  Upon information and belief, Defendant Kyle Schneider was an employee or agent of Defendant Off Duty Services who was acting within the course and scope of said employment at the time of the subject incident described herein.

5.      Defendant Walmart, Inc. is a foreign corporation with its principal place of business in Bentonville, Arkansas, that is registered to do business in Ohio.  Upon information and belief, Defendant Schneider was an employee or agent of Defendant Walmart who was acting within the course and scope of said employment and/or agency at the time of the subject incident described herein.  Defendant Schneider was acting at the request, direction, and under the supervision of employees of Defendant Walmart and was furthering the interests of Defendant Walmart at the time of the subject incident.

## JURISDICTION & VENUE

6.      Plaintiff alleges violations of Alex Menhenett's federal civil rights under color of state law in violation of 42 U.S.C. §1983.  This Court has original jurisdiction in this matter pursuant to 28 U.S.C. §1331 and §1343.  Plaintiff also alleges state law claims against certain Defendants.  This Court has jurisdiction over these state law claims pursuant to 28 U.S.C. §1367(a).

7.      Venue is proper in the Southern District of Ohio, Eastern Division, because the claims alleged herein arose in Franklin County, Ohio.

## FACTS

**(A)      Relevant Background Regarding Alex Menhenett**

8.      Alex Menhenett was 43 years old at the time of his death.  He was approximately 5 foot 10 inches tall and weighed approximately 180 pounds.

9.      In December of 2001, Alex, age 21 at the time, was involved in a severe car crash that rendered him permanently disabled.  Alex was found unresponsive at the crash scene with cerebrospinal fluid and blood leaking from both of his ears.  He was rushed by squad to The Ohio State University Medical Center where he was found to have severe head and facial

injuries, including what was described as an enormous epidural hematoma with significant midline shift and a large skull fracture that extended across the entire region of his head. He underwent emergency surgery to evacuate the hematoma. He developed hydrocephalus which required surgery for the placement of a right ventriculoperitoneal shunt. Alex thereafter embarked on a lengthy hospitalization and rehabilitation course.

10. The injuries that Alex suffered in this car crash left him deaf in both ears. He had a left cochlear implant procedure in June 2003 to help him hear.

11. Although the cochlear implant helped, Alex was still significantly limited in his ability to hear and process, including difficulty localizing sound, hearing in noisy or public places, and he had trouble understanding a person speaking without lipreading. Alex also experienced significant problems with tinnitus following his cochlear implant which made it difficult for him to sleep.

12. Alex's traumatic brain injury caused him to regularly slur his words and those who knew him report that he was difficult to understand at times. His traumatic brain injury also caused him balance issues and it often looked like he was swaying while walking.

13. Alex was a chronic alcoholic. His alcoholism was either triggered, or significantly exacerbated, by his severe traumatic brain injury. Alex would regularly rely on alcohol to overcome the ringing in his ears from tinnitus so he could sleep at night. Although Alex tried to overcome his alcoholism through multiple detox attempts, he was unable to shake the disease prior to his death.

14. Alex developed a significant alcohol tolerance level much greater than the average drinker from being a chronic alcoholic.

15.     In addition to the car crash, Alex suffered several other severe insults to his head over the years that negatively impacted him.  He had multiple episodes of alcohol withdrawal induced seizures when he would try to stop drinking, he was knocked unconscious after being pistol whipped and kicked in the head during an assault in or about November 2014, and he hit his head against a wall after being jumped and beaten by several juveniles around October 2019.

**(B)     Relevant Background Regarding Defendant Kyle Schneider**

16.     Defendant Schneider, age 54, is reportedly 5 foot 11 inches and weighs 175 pounds.

17.     Defendant Schneider worked part time as a constable for the Sharon Township Police Department from approximately February 2001 to April 2005.

18.     Defendant Schneider had a history of disciplinary issues while employed by the Sharon Township Police which reflected an overzealous desire to be involved in what he felt was exciting police action even when his conduct was dangerous or violated established policies and procedures of the Sharon Township Police.  For example, Defendant Schneider was disciplined for not using reasonable discretion responding to a call for assistance when he drove his cruiser more than 100 mph through intersections without using both lights and sirens and traveling left of center on a busy highway.  He also improperly responded to multiple police calls outside the jurisdiction of the Sharon Township Police.  Specifically, Defendant Schneider frequently monitored the radios of the Columbus and Worthington Police Departments to listen for calls that he felt were exciting or interesting.  Without permission or being requested to respond to these calls outside of his jurisdiction, Defendant Schneider repeatedly responded to them anyway in violation of Sharon Township Police policy and the mutual aid agreements between these police agencies.   The reported reason that Defendant Schneider did this was because he was bored with

the more benign police duties in Sharon Township and was seeking to be involved in more active police action. Said incidents triggered an internal affairs investigation in or around August 2003 by the Sharon Township Police where it was determined that Defendant Schneider was in violation of the charges brought against him. As documented in a disciplinary action against Defendant Schneider, a Sharon Township lieutenant believed that "Constable Schneider is looking to be a hero and to claim all the glory of a situation." Instead of termination, Defendant Schneider received a written reprimand and was counseled regarding the danger of his actions.

19.    After being reprimanded, Defendant Schneider continued to defy orders by improperly responding to calls outside his jurisdiction without being requested or notifying his superiors of his actions. This conduct triggered another internal affairs investigation by the Sharon Township Police. In February 2005, Defendant Schneider was advised that departmental charges were going to be filed against him and a recommendation for his dismissal was going to be made to the Sharon Township Board of Trustees. Defendant Schneider resigned from his position with the Sharon Township Police on April 6, 2005, before the investigation was completed.

20.    Defendant Schneider was out of police work until becoming an auxiliary police officer for the Whitehall Police Department in March 2019 and being hired by Defendants Off Duty Services, and/or Walmart. During the background check conducted by the Whitehall Police Department, Chief Schwind of the Sharon Township Police reportedly told the Whitehall Police investigator that "although [Defendant Schneider] is honest and has adequate initiative, he uses limited judgment, and has poor ability to follow orders." Chief Schwind reportedly also said that Defendant Schneider would not be considered eligible for rehire by the Sharon Township Police.

21.     As an auxiliary police officer, Defendant Schneider was routinely assigned to work at Walmart located at 3657 E. Main St. in Whitehall.  Upon information and belief, Defendant Schneider was employed and compensated by Defendants Off Duty Services and/or Walmart for the security work that he performed at Walmart.

22.     Defendant Schneider's judgment as a police officer continued to be a concern while working at Walmart as evident by a memo prepared by Whitehall Police Lieutenant C. Huntzinger to Deputy Chief Daniel Kelso captioned "Request for additional review of Aux. Officer Schneider's ability to work alone at special duty or any other assignments based upon his history of poor decision making under stress."  Lieutenant Huntzinger wrote in this memo that his review of prior incidents at Walmart involving Defendant Schneider "highlighted a disregard for training, poor decision making and lack of competence to perform as expected."  Lieutenant Huntzinger documented his concerns about Defendant Schneider's ability to perform under stress and stated others in the Whitehall Police Department shared these same concerns about his ability to safely function on his own.  The memo went on to state:

> "I know of at least two occasions where suspects have resisted arrested [sp] or at a minimum obstructed officer's attempts to gain compliance involving Officer Schneider when [he] is working with another officer at special duty.  Both of these were resolved well with minimal force used, minimal disruption for other citizens at the business and minimal response by other officers because it was resolved quickly and effectively.

> It would appear that he has far less trouble acting as a partner or in a support capacity with another officer than he does when he is acting as a solo officer.  Officer Schneider's drive and desire to work hard are not in question, just whether or not it is within his ability to do so alone, especially at such a high call volume assignment like Walmart."

23.     This memo from Lieutenant Huntzinger establishes that Defendants knew, or should have known, that Defendant Schneider had a history of poor decision making when working alone and his competence to work special duty alone at Walmart was in significant question.

**(C)** <u>**The Subject Incident**</u>

24.     On January 19, 2024, Defendant Schneider was again working special duty alone at Walmart located at 3647 E. Main St. in Whitehall.

25.     That same day, Alex, age 43, took public transportation to this Walmart store to purchase a space heater to help heat his apartment for the winter.

26.     Exhibit 1 of this Complaint is a disc containing a copy of the video of the subject incident from Defendant Schneider's body camera and surveillance video from Walmart of the subject incident. Plaintiff will file the actual disc if/when leave is granted by the Court to do so. Said video is incorporated herein.

27.     Walmart surveillance video shows Alex walking in the store with a space heater in hand. This video does not show him speaking to any other customer or being offensive in any way. The video also does not show any conduct by Alex that put him, other customers, or property at risk whatsoever.

28.     Alex entered the self-checkout area in the store trying to purchase the heater. This self-checkout was a rectangular closed off area surrounded by kiosk machines. There was one Walmart employee, believed to be Bradley Winston, stationed in the area to assist customers.

29.     Surveillance video shows that Alex walked along the outside of the self-checkout area while two customers were inside the area making purchases. Alex briefly interacted with Mr. Winston in an apparent attempt to purchase the heater. Mr. Winston reportedly told Alex that the self-checkout was closed during this interaction. Either confused or displeased that he was unable to make a self-checkout purchase while others were, Alex walked back the way he came and entered the self-checkout area through another entry point. He then stood with the heater in hand to try again to make the purchase.

30.     Mr. Winston briefly spoke to Alex again inside the self-checkout area where he reportedly told him that the self-checkout was closed and to leave the area.  Meanwhile, there was a customer next to Alex in the process of performing a self-checkout.  Mr. Winston thereafter made a call to the Walmart's Asset Protection team where he allegedly reported that there was a drunk customer in the area who would not leave.

31.     Defendant Schneider and two other men, believed to be Walmart employees Dustin Platt and Andrew Freeman, responded to the call.  Defendant Schneider reported that he was advised that there was an "intoxicated male at self-checkout refusing to leave and they wanted him out."  Notably, Defendant Schneider was not accompanied by a second police officer as his superiors at the Whitehall Police Department suggested given his documented history of poor decision making and incompetence.

32.     When the three men approached Alex in the self-checkout area, Alex was standing calmly with the heater in hand.  The situation was calm.  There were no other customers nearby. Defendant Schneider, Mr. Platt, and Mr. Freeman surrounded Alex as he continued to stand still holding the heater.

33.     The initial exchange between Alex and Defendant Schneider was cordial. Defendant Schneider asked Alex how he was doing and if he was looking to buy a heater.  Alex greeted Defendant Schneider by saying, "hey, how are you doing, sir?"  In response to Defendant Schneider's question, Alex said "I'm doing just fine. Just trying to pay for this [heater]…and for some odd reason they won't let me pay for it."

34.     Defendant Schneider then asked Alex if he was trying to pay for the heater through self-check-out.  Alex responded by saying "I guess this is self-check-out."  Alex then looked over to his right where Mr. Platt was standing and complimented him on his shirt.  After

thanking Alex for the compliment, Mr. Platt claimed that the self-check-out was only open to Spark drivers (Walmart delivery drivers) as Alex turned to face Defendant Schneider.

35.      Alex's cochlear implant, which was located on the left side of Alex's head above his ear, was clearly visible to Defendant Schneider during this interaction, and should have made Defendant Schneider aware that Alex suffered from a disability.  It is unlikely that Alex heard the comment made by Mr. Platt about the self-check-out lane being only open to Spark drivers because Mr. Platt was located on Alex's right side, which was opposite his cochlear implant, in a public place.  Indeed, Alex responded to the comment by saying "huh," indicating that he did not hear the comment.

36.      Alex then told Defendant Schneider once again in a calm tone that he was trying to pay for the heater because he wanted to head to a nearby Subway afterwards to buy a sandwich.  Rather than simply instructing Alex on where to go to purchase the heater, or alternatively telling him to leave the self-checkout area or the store altogether, Defendant Schneider escalated this misunderstanding or minor disturbance into a crime/arrest scenario by telling Alex that he noticed a couple of things going on with him and then asked Alex if he had any alcoholic beverages that day.   Unable to hear the question due to his hearing problem, Alex said "huh" in response.  Defendant Schneider repeated the question to which Alex responded by asking Officer Schneider "what's the matter?"  Officer Schneider then said to Alex, "[r]ight now you're not able to stand steady on your feet.  You're slurring your words.  It indicates that…" Alex responded to this accusation by telling Defendant Schneider, "I slur my words" to explain that slurring was a common speech habit for him caused by his disability.  Failing to take the time to appreciate what he was being told, Defendant Schneider responded by saying "that's what you just did.  That indicates you are in public intoxicated."

37.     Up to this point in the exchange, Defendant Schneider had not identified himself as a police officer.  The exchange continued with Alex suggesting that Defendant Schneider was intoxicated.  Defendant Schneider responded by saying, "[w]ell, actually I'm not."  Alex then said, "I think you are" to which Defendant Schneider said, "[y]ou can think that if you want to."  The apparent reason Alex made these comments to Defendant Schneider was to challenge the basis for Defendant Schneider's assumption that Alex was intoxicated.  Alex then stated, "[y]ou're inferring…" but was abruptly cut off from finishing his explanation by Defendant Schneider, who stated "[l]et's do this.  I'm not going to discuss this with you.  Go ahead and set the heater on the shelf."  Defendant Schneider proceeded to take the heater out of Alex's hands and place it on a nearby shelf.  He then grabbed Alex's left arm and ordered him to turn around and place his hands behind his back.

38.     Alex pulled his left arm back when Defendant Schneider put his hands on him.  In response, Defendant Schneider pointed at Alex and yelled, "do not resist.  Do you understand me?  You are under arrest.  Do not resist.  Place your hands behind your back."  This was the first mention of Alex being placed under arrest.  Apparently unclear as to what authority Defendant Schneider had to arrest him, Alex calmly asked him "what are you?"  It was only after Alex asked this question that Defendant Schneider finally identified himself as a Whitehall police officer.  Alex followed up with another question simply seeking clarification to which Defendant Schneider threatened, "place your hands behind your back or else I'm going to do it for you, and you don't want that."

39.     Alex put his hands behind his back as instructed by Defendant Schneider.  Indeed, there was never a time during this entire incident where Alex was aggressive, combative, verbally hostile, or threatening.  He also never raised his voice or attempted to flee.

11

40.     After Alex put his arms behind his back as instructed, Defendant Schneider told him to turn around.  After a brief pause, Defendant Schneider proceeded to walk behind Alex to cuff him.

41.     When a person is handcuffed in the rear, the hands and wrists are typically placed and cuffed in a position at or below the waist.  Here, Defendant Schneider initially grabbled the front of Alex's right arm above the elbow and then proceeded to pull Alex's right arm upward from behind, creating an uncomfortable position to be handcuffed.

42.     As Defendant Schneider grabbed Alex's arm in this manner, Alex moved his arms forward.  His right arm was free while Defendant Schneider maintained control of Alex's left hand/arm.  Alex turned his body to his left in the process while Defendant Schneider maintained control of Alex's left hand/arm.  The fact that Alex turned to his left and only pulled his right arm free suggests that his goal was to stop Defendant Schneider from handcuffing him in a painful manner.

43.     Defendant Schneider radioed for backup while he maintained control of Alex's left hand.

44.     Defendant Schneider used his right hand to control Alex's left arm above the elbow while using his left hand to grip Alex's left hand, which was in a downward position, and push it backwards in a painful position.  In what appears to be an attempt to avoid the pain of this maneuver, Alex used his right hand to grip Defendant Schneider's left hand.

45.     While both of Alex's hands were engaged, Defendant Schneider performed a front leg-sweep takedown on Alex, whereby Defendant Schneider (1) had a grip on one or both of Alex's hands while performing this takedown maneuver, (2) used a leg sweep to knock Alex's feet out from under him and displaced Alex's standing base, and (3) he pulled the now-airborne

Alex over his hip and forcefully downward head-first onto the cement floor. The time from the point that Defendant Schneider told Alex that he was under arrest to the point that Officer Schneider slammed Alex to the ground head-first was only approximately 42 seconds.

46. The fact that Defendant Schneider was holding one or both of Alex's hands while performing this takedown made it impossible for Alex to protect himself to soften his landing, resulting in his head violently slamming into the cement floor. A large amount of blood immediately poured from Alex's head after hitting the floor and he was immediately unresponsive. Defendant Schneider proceeded to handcuff Alex and then called for medical assistance.

47. As Alex laid on the floor in a puddle of blood, Defendant Schneider repeatedly asked for his name. Alex was largely unresponsive. Video shows Alex groaning on the cement floor while medics and other personnel attended to him. Minutes after being placed in handcuffs, the decision was made by the Whitehall Police that Alex did not need to stay in the handcuffs. He was thereafter transported by squad to Mount Carmel East Hospital for treatment.

48. Imaging studies conducted at Mount Carmel East Hospital determined that Alex suffered a significant acute right subdural hematoma, a subfalcine brain herniation with approximately 5 mm leftward displacement of the third ventricle, and an acute subarachnoid hemorrhage. He also suffered a left orbital wall fracture.

49. Alex's medical condition deteriorated to the point that he required intubation soon after arriving at the hospital. Despite the best efforts by his medical providers, Alex tragically died from his injuries on January 24, 2024. The Franklin County Coroner's Office determined the cause of death as sequela of blunt force trauma with skeletal and brain injuries. The manner of death was listed as homicide.

13

    **(D)**     <u>**Charges Filed Against Alex Menhenett**</u>

    50.     Multiple police officers quickly arrived at the scene in response to Defendant Schneider's call. After the incident, one officer can be heard on Defendant Schneider's body cam footage asking Defendant Schneider what the charges were against Alex. Defendant Schneider answered, "public intoxication" and resisting arrest.

    51.     There is no crime under Ohio law for "public intoxication." Nonetheless, Defendant Schneider admitted moments after the incident that public intoxication was the reason he arrested Alex.

    52.     Given that public intoxication is not a crime, the criminal complaint filed against Alex changed the charge against him to disorderly conduct in violation of Ohio R.C. §2917.11(B)(2). He was also charged with resisting arrest in violation of Ohio R.C. §2921.33.

    53.     R.C. §2917.11(B)(2) states that "[n]o person, while voluntarily intoxicated, shall…[e]ngage in conduct or create a condition that presents a risk of physical harm to the offender or another, or to the property of another." A violation of R.C. §2917.11(B)(2) is a minor misdemeanor.

    54.     The criminal complaint against Alex was authored by Whitehall Police Officer Christopher Lozier. According to the complaint, "Alexander was intoxicated so much so that Officer Schneider #A31 stated Alexander could not reasonably care for himself." In other words, the sole reason that Defendant Schneider arrested Alex was to prevent Alex from hurting himself. The irony that Defendant Schneider used lethal force to accomplish an arrest for a minor misdemeanor charge aimed to protect the offender from hurting himself is not lost in this case.

    55.     There is no evidence that Alex presented a risk of physical harm to himself. There is no evidence from the in-store surveillance cameras indicating that Alex was at risk of

physically harming himself; there is no evidence in the body camera video of the interaction between Defendant Schneider and Alex, that Alex was at risk of physically harming himself; Defendant Schneider never indicated during the interaction that he was concerned that Alex may physically harm himself prior to making the arrest; no eyewitness indicated that Alex was at risk of physically harming himself; and Defendant Schneider never indicated in his written report after the incident that he was concerned that Alex was at risk of physically harming himself. Rather, the video proves that Alex was arrested because Defendant Schneider perceived him to be intoxicated and did not like that Alex challenged Defendant Schneider's assumption that he was drunk.

**(E)** **Whitehall Police Use of Force Policy**

56. Whitehall Police Department's Use of Force Policy states, "Whitehall officers may only use the force which is reasonably necessary to affect lawful objectives including: affecting a lawful arrest or overcoming resistance to a lawful arrest, preventing the escape of an offender, or protecting or defending others or themselves from physical harm."

57. Regarding deadly force, the policy states "[t]he preservation of human life is of the highest value in the State of Ohio. Therefore, employees must have an objectively reasonable belief deadly force is necessary to protect life before the use of deadly force. Deadly force may be used only under the following circumstances: 1. To defend themselves from serious physical injury or death; or 2. To defend another person from serious physical injury or death."

58. The Use of Force policy goes on to state that "[w]hen responding to resistance, the response must be based on the actions and behavior of the suspect/subject and must be reasonable for the situation…Officers shall use only that response to resistance that is reasonable to affect an arrest, detention, or mission."

59.     The Whitehall Police Department utilized the CARA model (Condition, Action, Response, Assess) as a general guideline used for subject control and officer defense.  The Use of Force Policy recognizes, however, that all responses to resistance incidents are to be evaluated based on U.S. and Ohio Supreme Cout decisions, in particular, *Tennessee v. Garner* and *Graham v. Connor*, not generic criteria set forth in this continuum.

**(F)     Excessive and Deadly Force Used Against Alex for an Unlawful Arrest**

60.     The arrest of Alex for "public intoxication," which was later changed to disorderly conduct, was unlawful because of a lack of probable cause with respect to all elements of this misdemeanor crime.  At best, there may have been evidence that Alex was intoxicated, but there is no evidence whatsoever from the in-store surveillance video, the video of the interaction by Defendant Schneider's body camera, eyewitness statements, or Defendant Schneider's own narrative report that Alex presented a risk of physically harming himself.  Without probable cause to arrest Alex, Defendant Schneider did not have the right to use force to effectuate the arrest.

61.     The right to be free from excessive force is a clearly established Fourth Amendment right.  In determining whether force was excessive, courts are required to determine whether "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation…nor will an officer's good intentions make an objectively unreasonable use of force constitutional."  *Graham v. Connor*, 490 U.S. 386, 397 (1989).  The facts and circumstances confronting Defendant Schneider in this case all show that the use of force, and the degree of force used, by Defendant Schneider were clearly unreasonable.

62. The crime that Alex allegedly committed is a minor misdemeanor. The alleged crime – disorderly conduct aimed at protecting Alex from hurting himself – was not violent or severe to justify the degree of force used by Defendant Schneider to effectuate this arrest. Indeed, Defendant Schneider used lethal force to arrest Alex for a minor misdemeanor.

63. Alex clearly did not pose an immediate threat to the safety of Defendant Schneider or anyone else in the store. This fact is acknowledged in the disorderly conduct charge as it was cited that Alex was at risk of harming himself, not anyone else in the store. Alex never yelled, displayed hostility, or made any threatening comments to Defendant Schneider. At most, he was a confused, disabled man who had likely been drinking who was simply trying to purchase a heater to warm his apartment and then go to Subway to buy a sandwich.

64. Alex did not actively resist arrest. He was not out of control, moving around violently, fleeing, or forcefully resisting arrest. Rather, he was behaving non-violently and was merely being noncompliant in the setting of an unlawful and painful arrest. Even the Whitehall Police Department classified Alex's level of resistance as "Non-Compliant/Non-Combative Resistance" in its post-incident review of the incident. At most, Alex's conduct was passive resistance, which weighs against the reasonableness of a use of force, especially deadly force as used by Defendant Schneider in this case.

65. Alex also did not attempt to evade arrest by flight. When Alex did turn his body to the left when Defendant Schneider attempted to handcuff him, Defendant Schneider maintained control of Alex and was within close proximity of him during the entire encounter.

66. This was not a situation where Defendant Schneider had to make a split-second decision in a tense, uncertain, and rapidly evolving situation. This was instead a cordial and calm situation in a confined area of a Walmart store with no bystanders or potential dangers

nearby at the time Defendant Schneider chose to arrest Alex.   Had Defendant Schneider, Mr.
Platt, or Mr. Freeman simply directed Alex on where to purchase the heater instead of Defendant
Schneider turning this simple misunderstanding into an unlawful and unnecessarily excessive
forceful arrest, this tragedy would have never happened.

   67. This was also not a situation where Defendant Schneider was outnumbered
against a threatening or physically imposing subject.  Defendant Schneider was accompanied by
two male Walmart employees who surrounded Alex in proximity during the entire incident.
Defendant Schneider was able to call for backup police officers to assist him as well.  These
backup officers arrived within minutes of the call, but Defendant Schneider had already escalated
the situation to the use of deadly force prior to their arrival.  In comparison, Alex was a subject
who was described by the Whitehall Police as intoxicated, confused, and non-combative who
was purportedly unable to reasonably care for himself.  Alex was not a threat whatsoever.

   68. Strikes to a person's head involve a substantially increased risk of harm.  The
Sixth Circuit has emphasized that an officer's decision to use force directed at the head involves
a heightened level of intrusiveness against the citizen being arrested.  *See Baker v. City of
Hamilton,* 471 F.3d 601 (6th Cir. 2006).  Here, Defendant Schneider knew, or should have
known, that this leg sweep takedown maneuver posed a substantial risk of causing a head injury
given that he intentionally and forcefully propelled Alex downward headfirst onto a concrete
floor without Alex having any ability to protect himself because one or both of his arms were
engaged by Defendant Schneider.  By holding one or both of Alex's hands during the takedown,
Defendant Schneider made it impossible for even a sober subject, much less an intoxicated one
who was purportedly being arrested because he was unable to care for himself, to use his hands
to soften his landing when he hit.  A severe head injury was inevitable by this takedown.

69. The violent act committed against Alex by Defendant Schneider was irrefutably deadly force because it did, in fact, kill him. The Sixth Circuit has held that force is considered deadly when it poses a "substantial risk of causing death or serious bodily harm." *Robinette v. Barnes*, 854 F.2d 909, 912 (6th Cir. 1988). Defendant Schneider intentionally propelled a non-combative man, whom the Whitehall Police Department claims was so intoxicated and helpless that he needed to be arrested to prevent him from physically harming himself, head-first into a hard and entirely unforgiving solid concrete slab floor; Defendant Schneider knew, or should have known, the danger that slamming a person's head into a cement floor presented before he performed this maneuver on Alex; and Defendant Schneider knew, or should have known, that Alex was incapable of protecting himself against this impact prior to employing this maneuver. Defendant Schneider necessarily must have driven or pulled Alex's head into contact with the cement floor with great force because it caused Alex to suffer a significant subdural hematoma, brain herniation, a subarachnoid hemorrhage, an orbital wall fracture, and ultimately death.

## FIRST CLAIM FOR RELIEF:  FALSE ARREST

70. Plaintiff incorporates all previous paragraphs herein.

71. Said acts by Defendants constituted an unlawful arrest which lacked probable cause in violation of 42 U.S.C. §1983 and the Fourth Amendment.

72. As a direct and proximate cause of this unlawful arrest, Alex Menhenett was stripped of his constitutional right to be free from unlawful seizure and arrest and was subjected to excessive force which caused him severe physical injury, pain and suffering, emotional distress, incurred medical expenses, and ultimately his wrongful death.

## SECOND CLAIM FOR RELIEF – EXCESSIVE FORCE

73. Plaintiff incorporates all previous paragraphs herein.

74.     Said acts by Defendants constituted unreasonable and excessive force upon Alex Menhenett in violation of 42 U.S.C. §1983 and the Fourth Amendment.  The actions of Defendant Schneider were malicious, willful, wanton, and displayed a reckless disregard for Alex Menhenett's constitutional rights and his welfare.

75.     As a direct and proximate cause of the excessive force, Alex Menhenett was stripped of his constitutional right to be free from unlawful and excessive force.  Alex was subjected to excessive force which caused him severe physical injury, pain and suffering, emotional distress, incurred medical expenses, and ultimately his wrongful death.

**THIRD CLAIM FOR RELIEF:  MUNICIPAL LIABILITY**

76.     Plaintiff incorporates all previous paragraphs herein.

77.     The unlawful acts of Defendant Schneider were proximately caused by policies and customs of Defendant City of Whitehall, including the inadequate training and supervision of auxiliary and police officers, reckless hiring and retention of persons as auxiliary and police officers, and the customary tolerance of or acquiescence to police misconduct, including inadequate disciplinary consequences for federal rights violations.

78.     Officials with final decision-making authority, up to and including the Chief of Police, approved of and ratified these customs and policies and the illegal action taken herein by Defendant Schneider, including failing to investigate whether Defendant Schneider's arrest of Alex Menhenett was lawful, determining that Defendant Schneider's use of force against Alex Menhenett was justified, and hiring Defendant Schneider as a full-time police officer for the Whitehall Police shortly after this incident.

79.     As a direct and proximate cause of said conduct by Defendants, Alex Menhenett was stripped of his constitutional right to be free from unlawful arrest and excessive force.  Alex

was subjected to excessive force which caused him severe physical injury, pain and suffering, emotional distress, incurred medical expenses, and ultimately his wrongful death.

### FOURTH CLAIM FOR RELIEF: ASSAULT AND BATTERY

80.     Plaintiff incorporates all previous paragraphs herein.

81.     Said acts by Defendant Schneider constituted the torts of assault and battery under Ohio law. Defendant Schneider subjected Alex Menhenett to intentional and offensive bodily harm which caused him significant physical injury, pain and suffering, emotional distress, incurred medical expenses, and wrongful death.

82.     At the time of the assault and battery committed by Defendant Schneider on Alex Menhenett, Defendant Schneider was acting within the course and scope of his employment with Defendants Off Duty Services and Walmart in furtherance of their business interests, thereby making these specific Defendants liable under the doctrine of *respondeat superior* and Ohio agency law.

### FIFTH CLAIM FOR RELIEF: NEGLIGENT HIRING, TRAINING, AND RETENTION

83.     Plaintiff incorporates all previous paragraphs herein.

84.     Defendants Off Duty Services and Walmart knew, or should have known, of Defendant's Schneider's work history at Sharon Township Police and his dangerous and overaggressive tendencies that led to his resignation prior to being terminated. Despite this readily available information, Defendants Off Duty Services and Walmart hired him to work special duty assignments at Walmart, putting customers and the public at risk.

85.     Defendants Off Duty Services, Protos Security, and Walmart knew, or should have known, of the issues surrounding Defendant Schneider's competence and judgment while working special duty at Walmart, especially in circumstances where he was acting as a solo

officer, as this concern was documented by the Whitehall Police Department and had arisen based upon incidents at this same store.  Despite this readily available information, Defendants Off Duty Services and Walmart retained Defendant Schneider and failed to provide him with the proper training on how to engage customers who are not committing crimes.

86.     Said conduct on the part of Defendants Off Duty Services and Walmart was negligent.

87.     As a direct and proximate cause of said negligence by Defendants Off Duty Services and Walmart, Alex Menhenett was subjected to an unlawful arrest, excessive force, and assault and battery which caused him severe physical injury, pain and suffering, emotional distress, incurred medical expenses, and ultimately his wrongful death.

### SIXTH CLAIM FOR RELIEF – SURVIVORSHIP & WRONGFUL DEATH

88.     Plaintiff incorporates all previous paragraphs herein.

89.     Defendants' actions caused Alex Menhenett to experience conscious pain and suffering, medical treatment, and emotional distress prior to death.  Plaintiff hereby asserts a survivorship claim.

90.     Defendants' actions caused the wrongful death of Alex Menhenett to entitle his family members all damages recoverable under Ohio's wrongful death statute.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages in excess of $75,000, punitive damages, reasonable attorney fees, and costs.

Respectfully submitted,

*/s/ Michael J. Rourke*
Michael J. Rourke (0022950)
Timothy M. Mahler (0079574)
ROURKE & BLUMENTHAL, LLC
495 S. High Street, Suite 450
Columbus, Ohio 43215
(614) 220-9200 – Telephone
(614) 220-7900 – Facsimile
mrourke@randbllp.com
tmahler@randbllp.com

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues triable under the law.

*/s/ Michael J. Rourke*
Michael J. Rourke (0022950)